$400

LFR

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA



FILED
CLERK, U.S. DISTRICT COURT
APR 2 9 2016
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, EX REL. | CIVIL ACTION NO. |
| ALLISON ERICKSON<br>9442 Stanley Ave. S<br>Bloomington, MN 55437 | 15  1424 |
| AND SARA LUEKEN<br>3601 Park Center Blvd, #208<br>St. Louis Park, MN 55416 | QUI TAM COMPLAINT<br><br>JURY TRIAL DEMANDED |
| PLAINTIFFS, | FILED IN CAMERA AND<br>UNDER SEAL PURSUANT<br>TO 31 U.S.C. § 3730(B)(2) |
| V. |  |
| INSYS THERAPEUTICS, INC.,<br>1333 South Spectrum Blvd, Suite 100<br>Chandler, AZ 85286 |  |
| DEFENDANT. |  |

FILED
MAR 19 2015
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

CV 16-02956 DSF (SK)

RECEIVED
CLERK, U.S. DISTRICT COURT
APR 25 2016
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

## I.    INTRODUCTION

Qui Tam Relators Allison Erickson and Sara Lueken, through their counsel, Robins Kaplan, LLP, on behalf of the United States of America, bring this Complaint against Insys Therapeutics, Inc., and allege based upon their own direct and independent knowledge:

1.    This is an action to recover damages and civil penalties on behalf of the United States of America, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Insys and/or their agents, predecessors, successors, and employees in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq., as amended ("the FCA" or "the Act").

2.    For the past several years, Insys, a pharmaceutical company headquartered in Arizona, has engaged in a campaign to market Subsys®, a transmucosal immediate release

fentanyl ("TIRF") drug, for uses that were not approved by the FDA, were not covered by federal healthcare programs, and presented serious risk of patient harm, including respiratory failure and death.

3. As Insys knew or should have known at all times relevant to this Complaint, claims for payment for a substantial portion of the "off-label" prescriptions that the company caused to be written would be submitted to and paid by federal healthcare programs, including the Medicare and Medicaid programs. And, as Insys knew or should have known, because those claims were not for a covered use of the drug, they were not payable.

4. Insys not only improperly marketed Subsys® to physicians, but also provided valuable administrative assistance to physician offices at no charge in order to induce referrals to federal healthcare programs.

5. In addition, the company's representatives repeatedly provided materially false information to federal healthcare programs in order to cause payment for Subsys® prescriptions.

6. Insys's calculated and systematic campaign to promote off-label use of Subsys® has resulted in substantial economic harm to the federal healthcare programs in the form of payments that, but for Insys's illegal conduct, would not have been made. But the company's efforts have also put patients' safety at risk. Subsys® is an opioid. Not only is it highly addictive, but, as the FDA recognized in limiting its approved use, presents significant health risks, including respiratory failure and even death.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

8.     This Court has personal jurisdiction and venue over Insys pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Insys have minimum contacts with the United States. Moreover, the Insys transacts business in this District.

9.     This Court has personal jurisdiction over the Insys pursuant to 52 Pa. Consol. Stat. Ann. § 5322, which provides a basis for personal jurisdiction over Insys outside the Commonwealth of Pennsylvania who transact business in the Commonwealth.

10.     This Court has jurisdiction over actions brought under individual state laws under 31 U.S.C. § 3732(b) because the actions brought under state law arise from the same transaction or occurrence as the action brought under 31 U.S.C. § 3730.

11.     Venue is also proper in this District pursuant to 31 U.S.C. § 3731(a) because Insys can be found in, and conducts business in this District. At all times relevant to this Complaint, Insys regularly conducted substantial business within the Eastern District of Pennsylvania, had employees based in Pennsylvania, and made significant sales within Pennsylvania.

## III.     THE PARTIES
### A.     Relators/Plaintiffs

12.     Relators Allison Erickson and Sara Lueken are residents of the state of Minnesota and citizens of the United States.

13.     The Relators are clinical regulatory pharmacists on the Audit and Regulatory team for a large pharmacy benefits manager ("PBM").

14.     Erickson earned her Bachelor of Science in Cell Biology in 2006 and her Doctor of Pharmacy from the University of Minnesota in 2010. Since 2010, she has worked as a

pharmacist, a clinical review pharmacist and now works as a clinical review regulatory pharmacist for a PBM.

15.     Lueken earned her Doctor of Pharmacy from the University of Iowa in 2007. Since 2007, she has worked as a pharmacy manager, a clinical review pharmacist and now works as a clinical review regulatory pharmacist for a PBM.

16.     As a pharmacy benefits manager, the Relators' employer contracts with healthcare plans around the country to administer the plans' prescription drug benefits. Their employer handles more than a dozen Medicare Part D (prescription drug) plans and also works with numerous state Medicaid plans.

17.     The Relators, as clinical regulatory pharmacists with a focus on their employer's audit and regulatory practice, are responsible for auditing Medicare Part D plans to ensure that they comply with federal regulations. In this capacity, the Relators regularly evaluate the validity of coverage claims for prescription drug benefits under Medicare Part D.

18.     On November 14, 2014, the Relators undertook a year-to-date audit of all requests for coverage of transmucosal immediate-release fentanyl ("TIRF") drugs approved by their employer as part of their regular employment duties. During this audit, they discovered false and fraudulent information supplied by the Insys, Insys, as described herein.

**B.     Insys**

19.     Insys Therapeutics, Inc. is a drug manufacturer, marketer and seller. Insys is a Delaware corporation with its principal place of business at 1333 South Spectrum Blvd, Suite 100, Chandler, Arizona 85286. INSYS has employees based around the country, including in Pennsylvania.

20.     Insys manufactures and sells Fentanyl Sublingual Spray, an opioid approved by the FDA for treatment of breakthrough pain in cancer patients who are already receiving and tolerant to opioids for the management of chronic pain. The brand name for this drug is Subsys®.

## IV.    APPLICABLE LAW

### A.    Medicare

21.     Medicare is a federally funded and administered health insurance program that provides benefits to certain groups. The U.S. Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

22.     The Medicare program is divided into four components: 1) Part A, the hospital insurance benefits program, 42 U.S.C. §§1395c, 1395d; 2) Part B, the supplemental medical insurance benefits program, which pays for a portion of certain medical and other services, 42 U.S.C. §S() 1395j, 1395k, 1395i; 3) Part C, the Medicare Advantage Program, which allows CMS to contract with public and private entities to provide Medicare Parts A and B benefits to certain beneficiaries, 42 U.S.C. §1395w-21 *et seq.*; and 4) Part D, the voluntary prescription drug benefit program. 42 U.S.C. § 1395w-101 *et seq.*

### B.    Prescription Drug Coverage under the Medicare Part D Program

23.     The Medicare Part D Program provides beneficiaries with assistance in paying for out-patient prescription drugs. This massive out-patient prescription drug benefit was added to Medicare by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, ("MMA"), Pub. L. 108-173 (Dec. 8, 2003), 42 U.S.C. § 1395w-101 et seq. (2004 supplement), 42 C.F.R. § 423.506.

24.     The MMA provides that Medicare beneficiaries entitled to Medicare benefits under Part A or enrolled in Part B are eligible for Medicare Drug benefits under Part D. Section 1860D-2 of the Social Security Act, 42 U.S.C. 1395w-102, allows for prescription drugs to be provided to Medicare beneficiaries through "Medicare Part D" benefits.

25.     The MMA also created a subsidy available to certain employer, union, and other group Plans that provide retiree coverage to Part D eligible individuals that is at least equivalent to Part D coverage (the "retiree drug subsidy"). Section 1860D-22 of the Social Security Act, 42 U.S.C. § 1395w-132. Thus, the Federal government pays a Part D retirement subsidy to employers whose Plans provide prescription drug benefits similar to Part D Plans for their retired employees.

### C.     Medicare Part D Plan Sponsors

26.     Part D coverage is not provided through the traditional Medicare program. Instead, Medicare beneficiaries must enroll in one of many hundreds of Part D Plans offered by private companies. See MMA, Sections 1102, 1860D-1 through 1860D-42, and 1871 of the Social Security Act; 42 U.S.C. §§ 1302, 1395w-101 through 1395w-152, and 1395hh.

27.     A Medicare Part D Plan Sponsor is an entity that CMS certifies as meeting the requirements of Part D and that has contracted with CMS to provide Part D benefits. Section 1860D-41, 42 U.S.C. § 1395w-151(a)(13) and (14)(B). The term "Part D Sponsor" also includes employer and union-sponsored plans which offer qualified Part D prescription coverage. 42 C.F.R. § 423.4.

28.     The health insurance company submits a certified application to CMS to participate as a Part D Plan Sponsor to provide prescription drug coverage to qualifying Part D Plans. 42 C.F.R. §§ 423.502, 423.265 and 423.272. That application is a prerequisite for

- 6 -

contracting with CMS as a Part D Plan Sponsor. 42 C.F.R. § 423.504(b). CMS may deny an application to qualify as a Part D Sponsor based on the applicant's failure to comply with the terms of a previous year's contract with CMS, even if the applicant is currently meeting all of the requirements for Part D participation. 42 C.F.R. 423.503(b).

29. The Part D Plan Sponsor must also agree to comply with the requirements and standards of Part D and all the terms and conditions of payment. Section 1860D-12, 42 U.S.C. § 1395w-112(b)(1).

30. The contract between the Part D Plan Sponsor and CMS must include the elements listed in 42 C.F.R. § 423.505(b), including compliance with the reporting requirements as set forth in § 423.514 and the requirements set forth in § 423.329(b) for submitting drug claims and related information to CMS for its use in risk adjustment calculations. The Part D Plan Sponsor must also expressly agree to provide CMS with the information CMS determines is necessary to carry out payment provisions. 42 C.F.R. § 423.505(b)(8) and (9).

31. A Part D Plan Sponsor also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (32 U.S.C. §§ 3729 et seq.)" when it contracts with CMS. 42 C.F.R. 423.505(h)(1).

32. To qualify for Part D payments from CMS, before each plan year, each approved Part D Plan Sponsor must submit a bid, certified by an actuary, for each Part D Plan it will offer. 42 C.F.R. § 423.265. The bid contains a per member per month ("PMPM") cost estimate to provide Part D benefits to an average Medicare beneficiary in a specific geographic area. CMS considers both the tiered formulary structure and utilization management program components of the Part D Plan Sponsor's bid. 42 C.F.R. § 423.272(a)(2). From those Part D Plan bids, CMS

calculates nationwide and regional benchmarks which represent an average PMPM cost. If the Part D Plan Sponsor's bid exceeds the benchmark, the Plan Member must pay the difference.

33.     During each benefit year, CMS pays the Part D Plan Sponsors estimated payments on a monthly basis. In turn, Part D Plan Sponsors provide CMS with documentation of their actual costs. One required method for Part D Plan Sponsors to provide actual cost information to CMS is by submitting a Prescription Drug Event ("PDE") record for every prescription that is filled for a Plan Member.

34.     Each Part D Plan participant pays a monthly premium to the Part D Plan, as determined under the Part D Regulations. 42 C.F.R. §§ 423.153 and 423.293.

35.     In the year after each benefit year, CMS reconciles a Part D Plan Sponsor's actual prescription drug costs resulting from its PDE records against the Sponsor's bid. If a Part D Plan Sponsor's actual costs exceed its estimated costs, the Sponsor may be able to recover some of its losses through a risk-sharing arrangement with CMS. If, on the other hand, a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of its estimated payments to CMS.

36.     Thus, CMS pays the Part D Sponsor under Medicare Part D. The Part D Sponsor then pays the Part D Plan pharmacies for prescriptions, less the Medicare beneficiary's co-pay.

37.     The Part D Sponsor is required to make significant and material express certifications to CMS regarding the data it submits for payment:

> 1.     *Certification of Data that Determines Payment*: "As a condition for receiving a monthly payment ... the Part D Plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these

officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies." 42 C.F.R. § 423.505(k)(1).

2.  *Certification of Enrollment and Payment Information*: "The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(2).

3.  *Part D Sponsor Certification of Claims Data*: "The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

4. *Certification of Bid Submission Information*: "The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265." 42 C.F.R. § 423.505(k)(4).

38. The Part D Sponsor must expressly certify the accuracy and completeness of allowable costs for risk corridor and reinsurance information and of data for price comparison that it submits to CMS. 42 C.F.R. § 423.505(k)(5) and (6).

39. The entity that submits the Part D payment data, either the Part D Sponsor or PBM, must also make express certifications to CMS regarding Part D data used for payment. The entity submitting Part D claims data, the Part D Sponsor or the PBM, must certify:

> "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."

42 C.F.R. § 423.505(k)(3).

### D.    The relationship between Part D Sponsor and Pharmacy Benefits Managers

40. The regulations governing Part D benefits define major entities with which a Part D Sponsor may contract. 42 C.F.R. § 423.505(i). See also CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 – Part D Sponsor Accountability and oversight, p. 12. CMS has described these entities as "pharmacies or other providers, related entities, contractors, subcontractors, first tier and downstream entities."

41.     A "First Tier Entity" is a party with whom the Part D Sponsor has a written contract "acceptable to CMS with a Sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D." 42 C.F.R. § 423.501.

42.     In most cases, the "First Tier Entity" will be a pharmacy benefits manager, PBM. CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 – Part D Sponsor Accountability and oversight, p. 12.

**E.      Determining coverage for prescriptions under Medicare Part D**

43.     Most Medicare beneficiaries who enroll in Part D coverage are responsible for certain costs. These may include a monthly premium, an annual deductible, and/or co-pays.

44.     After receiving a prescription from his or her doctor, the Part D Plan beneficiary goes to a retail pharmacy and presents the prescription to the pharmacist, or submits a prescription to a mail order pharmacy.

45.     The pharmacy receives the prescription and beneficiary's information, and then submits required data elements to the Plan or its PBM to confirm Medicare Part D enrollment and identify co-pays. This process typically takes place through real-time data transmissions between the pharmacy and the PBM.

46.     The PBM reviews the pharmacy's initial data submission to conduct pre-dispensing/point-of-sale reviews of the Part D claim as required by federal law and regulations and pursuant to the contract between the Plan Sponsor and the PBM.

47.     Some PBMs require prior authorization for select prescription drugs. Drugs that require prior authorization usually present risks to patients or are particularly expensive. If a drug requires prior authorization, the beneficiary, beneficiary's appointed representative, or the prescriber can initiate a prior authorization determination with the PBM. To grant prior

authorization, the PBM often contacts the prescriber to confirm the beneficiary's diagnosis and need for the drug. The questions a PBM will ask to make the prior authorization determination depend on the drug and particular risks it presents.

48.     If the claim for the prescription is not rejected by the Sponsor or PBM, or if prior authorization is approved, the pharmacy receives payment authorization and co-pay information and dispenses the prescription to the Part D beneficiary. The beneficiary pays the co-pay to the pharmacy and receives the prescription. At the time of the initial data submission, the pharmacy transmits to the Plan Sponsor or PBM certain data elements specified by contract between the pharmacy and the Plan Sponsor or PBM. These data elements include, among other things, the beneficiary information, prescriber information, and drug information.

49.     Once the PBM or Plan receives data from the pharmacy, the PBM or Plan Sponsor submits the claim data to CMS via a Prescription Drug Event ("PDE") record.

50.     The Part D Plan or its PBM is required to also submit other data to CMS, *i.e.*, enrollment information, bid submission data, costs for risk corridor and reinsurance information, and data for price comparison. 42 C.F.R. 423.505 (k).

51.     Part D Sponsors are also required to submit other information to CMS regarding costs of providing Part D coverage, i.e., administrative costs, rebates, and other information.

52.     Sections 1860D-15(c) (1)(C) and (d)(2) of the MMA require Sponsors to submit data and information necessary for CMS to carry out payment provisions. For every prescription filled, the Part D Sponsor or its PBM prepares and submits a PDE record to CMS.

53.     The PDE record contains prescription drug cost and payment data that enables CMS to make payments to Plans and otherwise administer the Part D benefit.

**F.    CMS Part D Payments Based on PDE Claims Data Submitted to CMS**

54.    Sections 1860D-14 and 15 of the MMA provide that CMS pay Plans for Part D

benefits through subsidies and risk sharing.

55.    CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary

enrolled in the Plan. To make this payment, CMS pays a direct subsidy (a capitated payment) to

the Part D Plan in the form of advance monthly payments equal to the Part D Plan's standardized

bid, risk adjusted for health status as provided in § 423.329(b), minus a monthly beneficiary

premium as determined in § 423.286. 42 C.F.R. § 423.315(b).

56.    In addition to the direct subsidy, through low-income subsidies, CMS makes

payments to the Part D Plan for premium and cost sharing subsidies on behalf of certain subsidy-

eligible individuals as provided in § 423.780 and § 423.782. These types of premium and cost-

sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing

Subsidies" (LICS), and are documented and reconciled using PDE data submitted to CMS. CMS

"Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE),"

4.27.2006, page 41, Section 10.1. In the United States Territories, CMS issues grants in lieu of

LICS.

57.    Through retroactive adjustments and reconciliations, CMS also reconciles

payment year disbursements with updated enrollment and health status data, actual low-income

cost-sharing costs and actual allowable reinsurance costs as provided in § 423.343. See 42 C.F.R.

§ 423.315(f). Stated differently, CMS reconciles payments received by Part D Plans at the end of

the year to determine whether additional funds are due to or from the Part D Plan Sponsor.

58.    For private fee-for-service plans (as defined by § 422.4(a)(3)) that offer qualified

prescription drug coverage, CMS determines the amount of reinsurance payments to be made to

them as provided under § 423.329(c)(3). *See* 42 C.F.R. § 423.315(g).

59.     Thus, throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy (a monthly capitated payment) designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy (the Federal government's portion of cost-sharing payment for certain low-income beneficiaries); and (3) the reinsurance subsidy (the Federal government's share of drug costs for beneficiaries who have reached catastrophic coverage).

60.     A Part D Sponsor may also receive other payments from CMS resulting from year-end reconciliations and adjustments.

61.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs to calculate final payments and risk sharing amounts. 42 C.F.R. § 423.343. CMS determines the Plan's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

62.     CMS specifically relies upon and uses the following PDE cost and payment fields in its year end reconciliation: gross drug cost above out-of-pocket threshold, gross drug cost below out-of-pocket threshold, low-income cost-sharing subsidy, and covered D Plan paid amount (the four PDE data elements). The Sponsor, or its PBM, calculates the four data elements from the point-of-sale claims data submitted by the pharmacy using instructions provided by CMS.

63.     To receive Part D funds from CMS, Part D Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable Federal laws, regulations, as well as CMS instructions. 42 U.S.C. § 1860D-12(b)(1); 42 C.F.R. § 505(i)(4)(iv).

**G.    Medicare Part D payments to Part D Sponsors are expressly conditioned on submission of accurate, complete and true PDE data**

64.    As an express condition of payment by CMS, Part D Sponsors must submit data and information necessary for CMS to carry out the payment provisions found in § 1860D-15(c)(1)(C) and (d)(2) of the Social Security Act. Thus, CMS payments to a Part D Sponsor are expressly conditioned upon the Sponsor providing "information to CMS that is necessary to carry out this subpart, or as required by law." 42 C.F.R. § 423.322 (a).

65.    All contracts between Part D Sponsors and CMS require the Part D Sponsor to agree to "provide CMS with the information CMS determines is necessary to carry out payment provisions in subpart G of this Part (or for fallback entities, the information necessary to carry out the payment provisions in subpart Q of this Part)." 42 C.F.R. § 423.505(b)(9).

66.    To carry out these payment provisions, (42 C.F.R. § 423.329 determination of payments"), CMS mandates that Part D Sponsors submit data regarding drug claims that can be linked at the individual level to Part A and Part B and other information as CMS determines necessary. 42 C.F.R. § 423.329(b)(3)(i) (data collection).

*1.    Required information for PDE records*

67.    CMS has identified a set of data elements, Prescription Drug Event ("PDE") data, which are necessary to determine payments to Medicare Part D PDP Sponsors. The Part D Plan must submit a PDE record for each and every dispensing event. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

68.    The PDE record is a summary record that documents the final adjudication of a dispensing event by a PBM based on claims received from pharmacies. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

69.     There are 37 set data elements in the required data set for all PDE records: 15 elements for the National Council for Prescription Drug Program ("NCPDP") billing transaction, 5 data elements for the NCPDP billing response transaction, and 17 data elements identified by CMS for purposes of administering Part D. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

70.     Most of the Medicare Part D PDE data elements are the same elements developed by the NCPDP, which have been used for decades by PBMs, pharmacies, and other providers when submitting Medicare and Medicaid claims for prescription drugs to CMS for payment. In its "Instructions for Submitting Prescription Drug Event Data," dated 4/27/2006, at page 11, CMS stated: "Most data elements represent existing NCPDP fields where we employ the same definition and field values that are currently in use per the NCPDP version 5.1 drug claim standard." NCPDP version 5.1 was approved in September of 1999.

71.     When CMS identified "Data Elements for PDE Records," it clearly stated, and all parties were on notice, that submission of PDE data is an express condition of payment: "In this section, we list the required data elements that must be submitted on PDE records for payment ... This Section defines each data element and its specific potential use for CMS's payment process." CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 11, Sec. 2.

72.     CMS described the purpose of the various PDE data elements, noting that while much of the data is primarily used for payment, "some of the other data elements such as pharmacy and prescriber identifiers will be used for validation of the claims as well as for other legislated functions such as quality monitoring, program integrity, and oversight." CMS

"Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE),"
4.27.2006, pages 5-6, Section 1.4.

73.     CMS stated that the reporting "requirements apply to all Part D Plans." "Updated
Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006,
page 5. Thus, CMS data reporting requirements and instructions apply to all Part D Plans
(PDPs), Medicare Advantage Part Plans (MA-PDs), and any other entity providing Part D
benefits.

### 2.     *Certification of truth and accuracy in Part D claims*

74.     When submitting Part D PDE data to CMS, sponsors and their subcontractors,
*i.e.*, PBMs, must certify that all claims are true and accurate. CMS Prescription Drug Benefit
Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p.67,
citing 42 C.F.R. § 423.505(k)(3). "CMS requires that any entity that generates [Part D] claims
data on behalf of a Sponsor" must both: "certify to CMS the accuracy, completeness, and
truthfulness of that data;" and "acknowledge that the data will be used for purposes of obtaining
Federal reimbursement." *See* "Prescription Drug Benefit Manual, Chapter 9 – Part D Program to
Control Fraud, Waste, and Abuse," page 16, Section 40-2; citing 42 C.F.R. § 423.505(k)(3))
(emphasis added).

75.     In keeping with the requirements of 42 C.F.R. § 423.505(k)(3) and CMS
Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and
Abuse, Section 80.1, p.67, Sponsors and their subcontractors who submit Part D PDE data to
CMS must certify that it is true and accurate.

76.     This express certification of Part D PDE data has been included in CMS's
Electronic Data Interchange (EDI) Agreement (or a similar document) since January 2006. The

EDI Agreement must be executed in order for an eligible organization to submit PDE data electronically to CMS. The EDI is executed by Medicare Plans offering Part D prescription drug benefit and/or the Part D PBMs who submit PDE data on behalf of Part D Sponsors. The certification on the Part D EDI Agreement contains the following (or similar) language:

> "By signing below, the eligible organization certifies that each submission of PDE data pursuant to this Agreement will be accurate and complete to the eligible organization's best knowledge, information and belief."

77. CMS also requires, through the EDI Agreement, that the Part D Sponsor both: "ensure that every electronic entry can be readily associated and identified with an original source document (*e.g.*, an original drug claim) ...," and "retain all original source documentation pertaining to any such particular Medicare prescription drug event for a period of at least 10 years after the prescription drug event is received and processed."

78. CMS recognizes that the submission of "inaccurate or incomplete prescription drug event (PDE) data" constitutes Part D fraud, waste, or abuse. CMS Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse," page 56.

79. Part D Sponsors are also explicitly required to correct all previously submitted PDE data if the data was erroneous when initially submitted. CMS 2007 Part D Reporting Requirements page 4.

80. Part D Sponsors must make PDE data submissions to CMS at the end of the coverage year (or no later than 5 months after the close of the year) including PDE records, adjustments, and deletions. *See* 42 C.F.R. § 423.308. Part D Sponsors also submit cost reports at the end of the year. 42 C.F.R. § 423.343.

### H. Requirements to dispense "covered drugs" under Part D

81.     Pursuant to Section 1860D-2(e)(1)(A) of the Social Security Act, a "covered Part D drug" is defined as a drug that is "dispensed only upon prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1927(k)(2)." 42 U.S.C. 1395w-102(e). Part D allows payment for any use of a covered Part D drug for a medically accepted indication. § 1395w-102(e)(1)(B).

82.     Medically accepted indications include both the uses approved by the FDA and off-label uses supported by one or more of the three compendia specified in section 1927(g)(1)(B)(i) of the Social Security Act – *i.e.*, (1) American Hospital Formulary Service Drug Information; (2) United States Pharmacopeia-Drug Information; and (3) DrugDEX Information System. CMS charges PDP sponsors with ensuring that Medicare reimbursement for Part D drugs is limited to drugs provided for medially accepted indications.

83.     The term "covered outpatient drug" is defined in Section 1927(k)(2)(A) of the Social Security Act, 42 U.S.C. 1396r-8, to mean, "of those drugs which are treated as prescribed drugs for purposes of section 1905(a)(12) [the Medicaid statute], a drug which may be dispensed only upon prescription," except as provided in paragraph (5), and subject to the exceptions in paragraph (3). *See also* 42 C.F.R. 423.100.

84.     Although Medicare Part D drugs must meet all Medicaid requirements, all drugs covered under the Medicaid drug program are not necessarily covered under Part D. Section 1860D-2(e) of the Social Security Act, 42 U.S.C. 1395w-102(e)(2).

85.     Under Medicare Part D, CMS can pay only for drugs that both meet the definition of "covered Part D drug" and are approved for coverage under the Sponsor's specific Plan. Section 1860D-2(e) of the Social Security Act. See also 4/26/06 CMS Requirements for Submitting Prescription Drug Event Data, p. 20.

## I.     Prescription drug reimbursement under Medicaid

86.     Medicaid is a public assistance program providing for payment of medical expenses for the economically disadvantaged and disabled. Funding for Medicare is shared between the federal and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

87.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. 42 U.S.C. §§ 1396 *et. seq.*

88.     Federal reimbursement for prescription drugs under the Medicaid program is available for "covered outpatient drugs." 42 U.S.C. § 1396b(I)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for a "medically accepted indication." Id. § 1396r-8(k)(3).

89.     A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute. *Id.* § 1396r-8(k)(6).

## J.     Limitations on prescriptions for medically indicated uses only for all federal reimbursement programs

90.     Under the Food, Drug, and Cosmetics Act ("FDCA") 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) & (d). Approval of a drug by the FDA is the final stage of a multi-year process of study and testing.

91. The FDA does not approve a drug for treatment of sickness in general. Instead, a drug is approved for treatment of a specific condition, for which the drug has been tested in patients. The specific approved use is called the "indication" for which the drug may be prescribed. The FDA will specify particular dosages determined to be safe and effective for each indication.

92. The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which must also be reviewed and approved by the FDA. 21 U.S.C. §§ 352, 355(d).

93. Under the Food and Drug Administration Modernization Act of 1997 ("FDAMA"), if a manufacturer wishes to market or promote an approved drug for alternative uses—*i.e.* uses not approved by the FDA—the manufacturer must resubmit the drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C. § 360aaa(b) & (c). Until subsequent approval of the new use has been granted, the unapproved use is considered to be "off-label." "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population (*e.g.* treating a child when the drug is approved to treat adults.)

94. The FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication. However, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

95.     Although physicians may prescribe drugs for off-label usage, the law prohibits

drug manufacturers from marketing or promoting a drug for a use that the FDA has not

approved. Specifically, under the Food and Drug laws, (1) a manufacturer may not introduce a

drug into interstate commerce with an intent that it be used for an off-label purpose, and (2) a

manufacturer illegally "misbrands" a drug if the drug's labeling (which includes al marketing

and promotional materials relating to the drug) describes intended uses for the drug that have not

been approved by the FDA. 21 U.S.C. §§ 331, 352.

96.     An off-label use of a drug only ceases to be off-label if the manufacturer submits

a supplemental application and demonstrated to the satisfaction of the FDA that the product is

safe and effective for the proposed new use. 21 U.S.C. §360aaa(b) & (c).

97.     In sum, the FDCA prohibits drug companies from promoting approved drugs for

unapproved uses or from making misleading claims as to the drug's safety or effectiveness. See

21 U.S.C. §§ 331, 352, 355(d). This off-label regulatory scheme protects patients and consumers

by ensuring that drug companies do no promote drugs for uses other than those found to be safe

and effective by an independent, scientific government body, the FDA.

### K.     Anti-Kickback Statute

98.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) is a

criminal statute that prohibits anyone from knowingly or willfully paying or receiving

remuneration in exchange for referrals or the purchase of any item or service that may be paid

for by a federal healthcare program.  The statute arose out of congressional concern that

payments or things of value  provided to those who can influence healthcare decisions would

result in goods and services being provided that are medically unnecessary, of poor quality, or

harmful to patients.

99.     After amendments enacted pursuant to the Affordable Care Act, the AKS now specifically provides that a violation of the statute constitutes a false or fraudulent claim under the FCA. 42 U.S.C. §1320(g). "Remuneration" under the AKS has been broadly interpreted by courts to include anything of value – including office services provided at less than fair market value.

## V.     Violations of the FCA

### A.     Off-label prescriptions

100.    Subsys® is a transmucosal immediate release fentanyl ("TIRF") drug manufactured and sold by Insys. Subsys® is generically known as Fentanyl Sublingual Spray. It is a single-use product that delivers fentanyl, an opioid analgesic, for transmucosal absorption underneath the tongue.

101.    Like other TIRF drugs, including Abstral®, Actiq®, Fentora®, Lazanda®, and Onsolis®, Subsys® is an opioid. The FDA approves it only for the management of breakthrough severe pain in patients with cancer who are already receiving and are tolerant to opioid therapy for their underlying pain.

102.    Subsys® is unique among TIRF drugs in that it is a sublingual spray. Other TIRF drugs are not administered as sprays. Thus, Subsys® is uniquely positioned for patients with diagnoses of dysphagia, or difficulty swallowing, or those who are prone to tooth decay.

103.    TIRF drugs, including Subsys®, are currently subject to an FDA Risk Evaluation and Mitigation Strategy ("REMS") program due to the dangers they present. The REMS program requires evaluation of the risks and benefits of TIRF drugs by prescribers before a pharmacy may dispense a drug to a patient. Only authorized pharmacies may dispense TIRF drugs under the REMS program.

104.     The above limitations on Subsys® are for good reason. Subsys® presents life-threatening risks. In some patients it can cause respiratory depression – patients who are opioid intolerant may stop breathing and die with its use.

105.     In November 2014, the Relators completed a year-to-date audit review of all TIRF drug approvals as part of their employment responsibilities. During the audit, they discovered at least 13 Medicare beneficiaries who did not qualify for coverage for Subsys® prescriptions but received it nonetheless. Some of these beneficiaries have received coverage for over two years – which the Relators estimate has resulted in fraudulent payments of between $2-$3 million per beneficiary.

106.     The Relators have observed that doctors prescribe Subsys® for off-label uses, including general pain therapy for non-cancer patients.

107.     Only one percent of Subsys® prescriptions are written by oncologists.

108.     Medicare and Medicaid will not pay for such off-label uses. For a Subsys® prescription to be eligible for reimbursement under either program, it must be for a cancer patient who is already receiving round-the-clock opioid therapy for pain.

109.     The Relators have discovered that Insys – through its own sales representatives and through its customers (*i.e.*, doctors' offices) – has been systematically and routinely falsifying patient profiles in communications with the Medicare and Medicaid program to get approvals for off-label use of Subsys®.

110.     For each of the plans it manages, the Relators' employer, the PBM, requires a prior authorization before approving payment for a Subsys® prescription. That process requires the doctor's office to confirm that a patient meets the criteria for on-label use of the drug, including an active cancer diagnosis.

111.    The Relators have discovered that Insys sales representatives have been contacting the Relators' employer, claiming to be from a doctor's office, and falsely certifying that beneficiaries meet the requirements for approval when they do not.

112.    The Relators have found that Insys has also made false statements to get authorization for significantly higher dosages of Subsys® than would be appropriate. These higher doses result in greater payments for the drug, but present elevated risks to patient health.

113.    Over the course of several years, Insys has engaged in a sophisticated marketing plan to provide false information to PBMs to increase and encourage off-label prescriptions that CMS would not otherwise approve. These fraudulent practices have led to federal payments for off-label prescriptions for non-medically accepted uses of Subsys®.

### B.    Anti-kickback statute violations

114.    The Relators have discovered that Insys provides office services to doctors in the form of assistance in obtaining prior authorization for Subsys® prescriptions.

115.    In the Relators' conversations with Insys employees, the employees have stated that Insys has agreements whereby Insys provides doctors with specialists who handle prior authorizations on behalf of the doctor.

116.    For example, on November 14, 2014 Relator Erickson participated in a phone call with a woman named Alyssa. Alyssa stated she was calling from a beneficiary's doctor's office to obtain prior authorization for a Subsys® prescription. Erickson asked several questions to confirm Alyssa's physical location and Alyssa continued to insist that she was calling from the doctor's office. Erickson then asked if Alyssa was employed by Insys. At that point, Alyssa put Erickson on hold and transferred Erickson to speak with Alyssa's supervisor, Afryea. Erickson told Afryea that Alyssa transferred the called to Afryea when Erickson asked if Alyssa worked

for Insys. Erickson stated that Alyssa was misrepresenting herself as working for the beneficiary's doctor's office. Erickson stated that she had begun to see a pattern of Insys employees calling the PBM and stating that they were calling from a beneficiary's doctor's office. Afryea stated that doctors signed business associate agreements with Insys that allowed them to make prior authorization requests. Erickson stated that only a beneficiary, beneficiary's representative, or a prescriber may initiate a prior authorization determination. Erickson then explained that Insys employees seemed to be providing false patient information to gain approval for Subsys®. Afryea refused to answer questions about false information provided by Insys employees and would not answer questions about how Insys employees seeking prior authorizations were compensated.

117.    In Relators' 2014 year-to-date audit, a number of prior authorization requests came from individuals who stated they were calling "from the doctor's office." The Relators later confirmed that these individuals were Insys employees.

118.    These services induce prescriptions of Subsys®. The Relators' conversations with Insys employees suggest Insys did not charge doctors for those services.

119.    By providing administrative services to various physicians' offices below market price, Insys has induced doctors to prescribe Subsys®, knowing those prescriptions would generate claims for payment to Federal healthcare programs.

120.    This conduct violates the AKS and renders all subsequent prescriptions from those prescribers false claims under the FCA.

## C.    Representative false claims

121.    The following are examples of beneficiaries' claims for coverage for Subsys®

that the Relators identified in their audit of TIRF claims as being improperly submitted.[1]

122.    False claims for Subsys were paid on the following dates for the amounts listed:

a) A claim for beneficiary S.B. was paid on 2/27/2014 for $3,394.57;

b) Claims for beneficiary A.M. were paid on 4/15/2014 for $2,418.32; 5/8/2014 for $2,418.32; 6/5/2014 for $2,418.32; and 7/3/2014 for $2,418.32.

c) Claims for A.F. were paid on

d) Claims for beneficiary B.E. were paid on 6/26/2014 for $1,578.91; 7/10/2014 for $4,316.52; and 7/14/2014 for $24,415.33.

e) A claim for beneficiary R.R. was paid on 7/18/2014 for $5,137.12.

f) A claim for beneficiary R.B. was paid on 7/3/2014 for $843.87.

g) Claims for beneficiary M.B. were paid on 10/6/14 for $3,757.59; 11/4/2014 for $2446.40; 11/4/2014 for $1,937.17; 12/2/2014 for $2,446.40; and 12/2/2014 for $1,937.17.

h) A claim for beneficiary J.V. was paid on 11/10/2014 for $7,387.76;

i) Claims for beneficiary R.P. were paid on 9/15/14 for $323.82 and 9/19/14 for $1,756.28;

j) Claims for beneficiary C.D. were paid on 9/30/2014 for $1,224.41; 10/15/2014 for $1,344.84; 10/22/2014 for $3,429.38; 11/11/2014 for $3,532.65;

k) A claim for beneficiary P.B. was paid on 10/16/2014 for $7,468.92.

---

[1] To ensure compliance with the Health Insurance Portability and Accountability Act's Privacy Rule, the beneficiaries are identified by initials only.

l) Claims for beneficiary M.F. were paid on 10/14/2014 for $1,893.47; 9/7/2014 for $1,893.47; 9/5/2014 for $947.14; 8/8/2014 for $1,893.47; 7/10/2014 for $1,893.47; 6/12/2014 for $1,893.47; 5/5/2014 for $1,893.47; 4/24/2014 for $1,893.47; 3/17/2014 for $558.12; 2/17/2014 for $558.12; 1/20/2014 for $1,494.96; 12/23//2013 for $1,893.62; 11/26/2013 for $1,893.62; 10/25/2013 for $1,893.62; 9/27/2013 for $1,893.62; 8/30/2013 for $1,893.62; 8/6/2013 for $1,893.62; 7/9/2013 for $1,893.62; 6/11/2013 for $1,893.62; 5/17/2013 for $1,893.62; 4/18/2013 for $1,275.043/22/2013 for $418.59; 2/19/2013 for $560.44; 1/25/2013 for $1,001.79; 12/27/2012 for $1,420.45; 11/20/2012 for $1,420.45; 10/26/2012 for $1,420.45; 9/29/2012 for $1,688.11; 9/4/2012 for $1,688.11; 8/9/2012 for $1,688.11; 7/13/2012 for $1,688.11; 6/14/2012 for $1,688.11; 5/17/2012 for $1,688.11; 4/23/2012 for $1,688.11; 4/11/12 for $1,307.19; 2/28/2012 for $248.77; 1/31/2012 for $710.73; and 1/3/2012 for $1,691.96.

123. Representative examples of the practices of Insys employees to secure prior authorizations for Subsys® are outlined below.

124. A person named Tracy stated she was calling the PBM "from the clinic" on February 26, 2014 to obtain prior authorization for a Subsys® prescription for beneficiary S.B. Tracy stated that S.B. had diagnoses for "dysphagia unspecified, cervical cancer, and active malignancy." Tracy also stated that S.B. would using Subsys® in addition to Oxycontin. Tracy provided the phone number for S.B.'s pain management clinic and her fax number, which was an Insys fax number. The PBM approved the prior authorization request on February 26, 2014 and paid a claim on February 27, 2014. Relator Erickson investigated the PBM's approval of S.B.'s

claim on November 13, 2014. S.B. had no claims for Oxycontin or any anticancer medications. Erickson called S.B.'s pain management clinic and spoke with an employee who informed her that S.B.'s diagnoses were in fact intervertebral disc disorder, other chronic pain, chronic pain syndrome, and neoplasm-related pain. The pain management clinic's employee could not confirm a cancer diagnosis. Erickson concluded that the PBM would not have approved the Insys employee's prior authorization request for Subsys® had it known these diagnoses.

125.    Alisa called the PBM, stating she was calling from the doctor's clinic, on April 14, 2014 to request prior authorization for Subsys® for beneficiary A.M. Alisa stated A.M. had a diagnosis of active caner pain and stated A.M. was currently using Oxycontin. The PBM approved the prior authorization on April 15, 2014 and paid claims on April 15, 2014; May 8, 2014; June 5, 2014; and July 3, 2014. Relator Erickson called A.M.'s clinic on November 17, 2014 and spoke with a clinic employee who could not confirm that A.M. had an active cancer diagnosis.

126.    Alyssa called in a prior authorization request for beneficiary A.F. on May 14, 2014. Alyssa provided diagnoses of breakthrough cancer pain and dysphagia and stated that A.F. would remain on long-acting opioid Oxycontin, but that the dose of the Oxycontin could not be adjusted to control A.F.'s breakthrough pain episodes. The PBM approved the request on April 15, 2014. Prior authorization was approved on May 15, 2014, and claims were paid on May 16, 2014; June 23, 2014; July 16, 2014; August 8, 2014; September 3, 2014; October 6, 2014; November 6, 2014; and December 5, 2014. Relator Lueken called A.F.'s clinic and spoke with a health care professional on November 14, 2014. The clinic confirmed A.F. had diagnoses for 720.2, 721.3, and 721.42. A.F. did not have active cancer and there were no cancer diagnoses in

A.F.'s chart. The PBM would not have approved the prior authorization request for Subsys®
with these diagnoses.

127. Alyssa called in a prior authorization request for beneficiary B.E. on June 19,
2014, providing a diagnosis of cancer-related pain. Alyssa also stated that the doctor is aware the
medication is for the treatment of pain for cancer and is treating cancer related pain. The caller
also requested a quantity limit exception for the number of doses B.E. could receive per month.
The PBM approved the request on June 20, 2014 but denied the quantity limit exception. Alyssa
called again on July 30, 2013 and requested a quantity limit exception for a higher quantity
allotment per month. Alyssa provided her phone number at Insys, not B.E.'s clinic's phone
number. As the PBM requires a statement that the long-acting opioid's dose cannot be modified
before approving higher doses, the PBM called what they thought was B.E.'s clinic, but was in
fact Alyssa at Insys. Alyssa stated that B.E.'s long-acting opioid could not be modified due to
respiratory distress. The PBM approved the quantity limit exception authorization on July 30,
2013. Claims were paid on June 26, 2014, July 10, 2014, and July 14, 2014. Relator Lueken
called B.E.'s clinic to verify a diagnosis of cancer on December 24, 2014. The clinic could not
confirm this diagnosis and recommended that Lueken contact B.E.'s primary care physician.
Lueken called B.E.'s primary care physician, and an employee stated that B.E. did not have a
cancer diagnosis. B.E. had a diagnosis of chronic obstructive pulmonary disease, a lung disease.
B.E. had died in July 2014 due to complications associated with chronic obstructive pulmonary
disease. Without a cancer diagnosis, the PBM would not have approved either prior authorization
or the quantity limit exception for Subsys®.

128. Tamera called in a prior authorization request for beneficiary R.R. on July 9, 2014
and provided a diagnosis of post-laminectomy syndrome. Tamera also stated that R.R. would

use Subsys® for management of breakthrough pain of cancer and was using long-acting opioid medication. Tamera also stated that R.R. had tried and failed fentanyl citrate, Actiq and Fentora, and had dental caries, which heightens the risk for dental decay. As a spray without sugar, Subsys® does not pose any risk of dental issues or decay. The PBM approved prior authorization on July 9, 2014. A claim was paid on July 18, 2014. Relator Lueken called R.R. directly on September 9, 2014. R.R. confirmed R.R. had never been diagnosed with cancer. Lueken spoke with R.R.'s clinic on September 8, 2014. A clinic employee stated that R.R. did not have cancer and was using Subsys® for diagnosed lumbar pain syndrome, chronic pain, and post-laminectomy syndrome. Had the PBM known this diagnosis information, it would not have approved prior authorization.

129. On July 30, 2014, Tamara called to obtain prior authorization for Subsys for beneficiary R.B. based on diagnoses of malignant neoplasm of colon, unspecified site, malignant neoplasm of prostrate. Tamara also stated that R.B. was taking Oxycontin and the dose of the long-acting opioid could not be adjusted to control the breakthrough pain. The PBM granted a one-time approval for a claim paid on July 3, 2014. On November 13, 2013, Relator Erickson spoke with R.B.'s pharmacist, who provided R.B.'s doctor's phone number, as Tamara had only provided an Insys phone number. Erickson spoke with an employee at R.B.'s clinic who stated that R.B.'s diagnoses were post-laminectomy syndrome, spinal stenosis and lumbrosacral spondylosis. R.B.'s chart did not include any cancer diagnoses. On December 27, 2014, Relator Lueken spoke with R.B., who confirmed that although R.B. was diagnosed with cancer years ago, R.B. is now cancer-free. With this information, the PBM would have denied the prior authorization for Subsys®.

130.     David called on August 13, 2014, stating he was calling from the prescriber's clinic to obtain prior authorization for Subsys® on behalf of beneficiary M.B. David stated M.B.'s diagnoses included malignant neoplasm of ovary and chronic pain syndrome. The PBM approved prior authorization on August 13, 2014. Claims were paid on October 6, 2014; twice on November 4, 2014; and twice on December 2, 2014. Relator Erickson called M.B.'s clinic on November 13, 2014 and confirmed that M.B. does not have an active cancer diagnosis. The PBM would not have approved prior authorization for Subsys® with this information.

131.     Kimberly called on August 20, 2014 stating she was calling from the doctor's office to obtain prior authorization of Subsys® for beneficiary A.B. Kimberly provided a diagnosis of breakthrough cancer pain and chronic breakthrough pain. Prior authorization was approved on August 20, 2014 but no claims were paid. Relator Erickson called A.B.'s clinic to verify an active cancer diagnosis. The clinic employee stated that A.B. had prostate cancer which was in remission. The PBM would not have approved prior authorization without the breakthrough cancer pain diagnosis.

132.     On August 26, 2014, Kimberly called and stated she was calling from the doctor's office to obtain prior authorization of Subsys® for beneficiary J.V. Kimberly stated J.V.'s diagnosis was breakthrough cancer pain and requested a quantity limit exception for J.V. The PBM granted prior authorization on August 26, 2014. A claim was paid on November 10, 2014. Relator Lueken called J.V.'s clinic, and the office manager confirmed that J.V. did not have an active cancer diagnosis but had cancer in the past. J.V.'s current diagnoses, according to the office manager, were lumbar degenerative disease and internal derangement of the right hip. Lueken asked the office manager if anyone named Kimberly worked in the office since the

Subsys® prior authorization request originated with someone named Kimberly in the office. The office manager confirmed that no one named Kimberly worked at the clinic.

133. Ricki requested prior authorization of Subsys® for beneficiary R.P. on September 8, 2014. Ricki stated that R.P.'s diagnosis was chronic pain syndrome, the prescription was intended to manage R.P.'s breakthrough cancer pain, and R.P. would remain on a long-acting opioid. The PBM approved prior authorization on September 8, 2014. Claims were paid on September 15, 2014 and September 19, 2014. Relator Lueken called R.P's pain clinic on November 14, 2014 to verify the information from Ricki. The pain clinic employee stated R.P.'s diagnoses were fibromyalgia, neck and back pain, and neck spasm. The pain clinic employee confirmed R.P. did not have an active cancer diagnosis or a history of cancer. Lueken also confirmed that the clinic did not employ anyone named Ricki.

134. Alyssa called on September 26, 2014, stating she was calling from the doctor's office to obtain prior authorization of Subsys® for beneficiary C.D. Alyssa stated C.D. was using Subsys® for the treatment of bladder cancer and breakthrough cancer pain. She also stated C.D. was taking Oxycontin. The PBM approved prior authorization on September 26, 2014. Claims were paid on September 30, 2014; October 15, 2014; and November 11, 2014. On November 13, 2014, Relator Erickson spoke with C.D.'s dispensing pharmacist, who stated that C.D.'s diagnosis provided for all Subsys® prescriptions was chronic intractable pain. Relator Lueken called C.D. directly on December 23, 2014. C.D. told Lueken C.D. was diagnosed with bladder cancer 20-30 years ago and has since been declared cancer free. C.D. had a recurrence a year or two ago but was again treated and cleared, and has not had an active cancer diagnosis for one or two years.

135.    Alyssa called on October 3, 2014 to obtain prior authorization of Subsys® for beneficiary P.B. Alyssa stated P.B.'s diagnosis was breakthrough cancer pain and P.B. was taking Oxycontin. The PBM approved prior authorization on October 3, 2014 and a claim was paid on October 16, 2014. The PBM reopened the prior authorization request on October 7, 2014 as it should have been subject to a case management review. An employee of the PBM called Alyssa back to verify information she provided. Alyssa stated she was employed by the clinic and confirmed a diagnosis of breakthrough cancer pain. Alyssa could not provide the type of cancer P.B. had or the name of P.B.'s referring oncologist. Alyssa stated Subsys® was medically necessary and the dose was appropriate and safe. The review was approved for 12 months. On October 16, 2014, however, the request was reopened and denied. Relator Erickson received an email from a pharmacy director at one of the plans the PBM serves. The plan had been able to confirm with P.B.'s doctor that P.B. did not have an active cancer diagnosis and the plan requested the authorization be terminated. On November 21, 2013, the PBM denied a prior authorization request from a different prescriber for Subsys® on behalf of P.B. The diagnosis was chronic pain syndrome. On November 25, 2014, the second prescriber requested a peer-to-peer conversation with a pharmacist with the PBM. An employee at the prescriber's office confirmed the patient does not have cancer.

136.    The PBM had, since 2011, approved Subsys® for beneficiary M.F. based on the prescriber's statement that M.F. had cancer. Upon investigation, the Relators discovered M.F.'s diagnosis was carcinoid syndrome, which is not cancerous. One request during that time period came from Alyssa from Insys. A prescriber also sent in a fax on December 17, 2014 stating M.F. has cancer. An employee of the prescriber's clinic, however, stated M.F. did not have cancer. Chart notes from October 14, 2014 did not indicate cancer on M.F.'s active diagnoses list.

### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729 (a)(1)(A)

137.     Relators reallege and incorporate by reference the allegations contained in
paragraphs 1 through 136 of this Complaint.

138.     This is a claim for treble damages and penalties under the False Claims Act, 31
U.S.C. § 3729, *et seq.*, as amended.

139.     From January 2012 and continuing to the present, the Insys knowingly caused to
be presented to an officer or employee of the United States Government false or fraudulent
claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

140.     Specifically, through the acts and omissions described herein, the Insys knowingly
and intentionally made and caused others to make the submission of material false claims for
payment by Medicare Part D Plan Sponsors.

141.     In addition, Insys caused Medicare Part D Plan Sponsors and their agents,
including PBMs, to present materially false and/or fraudulent claims to officers of the United
States Government, including without limitation claims submitted to CMS as PDE claims and
other claims submitted for approval by CMS and for payment by CMS from Federal funds as
described above.

142.     As a prerequisite to participating in federally-funded health care programs,
including Medicare Part D, PBMs expressly certified (or, through their participation in a
federally funded program, impliedly certified) their compliance with applicable statutes and
regulations.

143.     The above-described Part D claims of PBMs that included false PDE data
submitted to PBMs by Insys to CMS were not eligible for reimbursement from Medicare Part D

because complete, accurate, and true PDE submissions were an express condition of payment under the Medicare Part D statute and applicable regulations.

144. During the time period relevant to this Complaint, the Part D claims submitted by the PBMs did not qualify for reimbursement under any of the various federal health care programs because Insys intentionally and fraudulently failed to adhere to Part D requirements by submitting false patient information to PBMs to induce coverage for Subsys® prescriptions.

145. Based upon the paid claims data of the Medicare Part D prescriptions adjudicated and obtained by PBMs, Insys improperly induced claims which did not qualify for reimbursement under any of the various Federal health care programs, including Medicare Part D, because there was no approval or support for such drugs to be eligible for reimbursement and/or because Insys' unlawful activity created overutilization of such drugs in situations where they were not medically necessary for treatment of patients' specific medical conditions.

146. The material conditions of payment with which Insys knowingly failed to comply include, *inter alia*:

      1.    that Insys caused to be submitted to Medicare claims for Subsys that were covered under Part D, but without a medically accepted indication;

      2.    that Insys caused to be submitted to Medicare claims for Subsys that were in violation of the AKS as a result of providing a benefit to physicians who prescribed Subsys in the form of office and administrative services to ease the process of prescribing Subsys.

147. Insys' unlawful practices caused false claims for Medicare Part D benefits to be submitted to CMS which affected both the benefits of the individual Part D member and, the payments made by CMS, including calculation of periodic Part D reconciliations and future

capitation payments CMS paid or would be paying to the Part D Sponsors involved, including MCS.

148.     By virtue of the acts described above, Insys knowingly caused to be presented, false or fraudulent claims to the United States Government for payment.

## COUNT 2
### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729 (a)(1)(B)

149.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 136 of this Complaint.

150.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

151.     From January 2012 and continuing to the present, Insys knowingly made or caused to be made false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

152.     The false records Insys caused to be made were the PDE records for Subsys claims that PBMs submitted Part D Sponsors, who in turned submitted them to CMS.

153.     As described above, each claim and record submitted by Insys representatives to a PBM and a Part D Sponsor through the PDE data was a false record or statement that was material to the submission of a false and/or fraudulent claim for payment.

154.     Each PDE record was "false" and/or "fraudulent" within the meaning of the FCA because it did not comply with a material condition of payment established by the Government.

155.     The material conditions of payment with which Insys knowingly failed to comply include, *inter alia*:

    1.     that Insys caused to be submitted to Medicare claims for Subsys that were

covered under Part D, but without a medically accepted indication;

    2.    that Insys caused to be submitted to Medicare claims for Subsys that were in violation of the AKS as a result of providing a benefit to physicians who prescribed Subsys in the form of office and administrative services to ease the process of prescribing Subsys.

156.    Unlawful practices by Insys caused false records for Medicare Part D benefits to be submitted to CMS which affected both the benefits of the individual Part D member and, the payments made by CMS, including calculation of periodic Part D reconciliations and future capitation payments CMS paid or would be paying to the Part D Sponsors involved, including MCS.

157.    In addition, claims for uses not eligible for payment under Medicaid were submitted to the program as a direct and foreseeable consequence of Insys's conduct.

158.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Insys, paid and continues to pay the claims that would not be paid but for Insys's illegal failure to comply with the requirements of Medicare Part D or the Medicaid program.

159.    By virtue of the acts described above, Insys knowingly caused to be presented, false or fraudulent records to the United States Government for payment.

160.    By reason of the Insys's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

WHEREFORE, Relators request the following relief:

    1.    Judgment against Insys for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each

violation of the Federal False Claims Act.

    2.    25% of the proceeds of this action if the United States elects to intervene,

and 30% if it does not.

    3.    Relators' fees, costs and expenses.

    4.    Such other relief as the Court deems just and appropriate

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

trial by jury.

Date: March 19, 2015   By: _____

        Bart D. Cohen
        Pa. Bar No. 57606
        **LAW OFFICE OF BART D. COHEN**
        1210 Prospect Hill Road
        Villanova, PA 19085-2115
        Telephone: 267-973-4855
        Facsimile: 484-223-3033


By: _____

        Christopher W. Madel
        Jeffrey S. Gleason
        Cassandra M. Batchelder
        **ROBINS KAPLAN L.L.P.**
        2800 LaSalle Plaza
        800 LaSalle Avenue
        Minneapolis, MN 55402-2015
        Telephone: 612-349-8500
        Facsimile: 612-339-4181


        Attorneys for Relators
        Allison Erickson and Sara Lueken

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

*Under Seal*
2:15-cv-1424

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States ex rel. Allison Erickson and Sara Lueken

**DEFENDANTS**
Insys Therapeutics, Inc.

15      1424

**(b)** County of Residence of First Listed Plaintiff  Hennepin Cty., MN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Maricopa Cty., AZ
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bart D. Cohen, Law Office of Bart D. Cohen   (see attachment for
1210 Prospect Hill Rd.                                     additional counsel)
Villanova, PA 19085; 267-973-4855

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       Another District
       *(specify)*

☐ 6  Multidistrict
       Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729 et seq.
Brief description of cause:
Defendant fraudulently ensured that federal healthcare programs would subsidize off-label uses for its product.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
    UNDER RULE 23, F.R.Cv.P.

DEMAND $  unascertained

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

MAR 19 2015

DATE
03/19/2015

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

```
Court Name: EDPA Philadelphia.
Division: 2
Receipt Number: PPE118043
Cashier ID: ttomas
Transaction Date: 03/19/2015
Payer Name: L.O. OF BART D. COHEN
-----------------------------------
CIVIL FILING FEE
  For: L.O. OF BART D. COHEN
  Case/Party: D-PAL-2-15-CV-001424-001
  Amount:        $400.00
-----------------------------------
PAPER CHECK CONVERSION
  Remitter: L.O. OF BART D. COHEN
  Check/Money Order Num: 505
  Amt Tendered:  $400.00
-----------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:        $0.00


Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $53 fee will
be charged for a returned check.
```

## Additional Counsel for Plaintiffs

Christopher W. Madel
Jeffrey S. Gleason
Cassandra M. Batchelder
ROBINS KAPLAN L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
612-349-8500

# UNITED STATES DISTRICT COURT

*Under Seal*

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

15    1424

Address of Plaintiff:  Allison Erickson, 9442 Stanley Ave. S, Bloomington, MN, 55437; Sara Leuken, 3601 Park Center Blvd., St. Louis Park, MN 55416

Address of Defendant:  Insys Therapeutics, Inc., 1333 South Spectrum Blvd., Suite 100, Chandler, AZ 85286

Place of Accident, Incident or Transaction:  Chandler, AZ

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐  No☑

Does this case involve multidistrict litigation possibilities?    Yes☐  No☑

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☑ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Bart D. Cohen _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE:  March 19, 2015 _____    _____    57606 _____

Attorney-at-Law    Attorney I.D.#

MAR 19 2015

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  3/19/15 _____    _____    57606 _____

Attorney-at-Law    Attorney I.D.#

CIV. 609 (5/2012)

 _Under seal_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

United States ex. rel Allison Erickson and
Sara Lueken                             :        CIVIL ACTION
                          v.            :
Insys Therapeutics, Inc.                :
                                        :        NO. 15   1424

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                      (x)

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( )


| March 19, 2015 | _[signature]_ | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 267-973-4855 | 484-223-3033 | Bart@BDCohenLaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

MAR 19 2015